## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENT PAPURELLO *and* LINDA PAPURELLO, *individually and on behalf of others similarly situated*, )<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>STATE FARM FIRE & CAS. CO., )<br>)<br>Defendant. ) | Civ. A. No. 15-1005 |

## OPINION

CONTI, Chief District Judge

## I.   INTRODUCTION

This insurance class action was removed to this court from the Court of Common Pleas of Allegheny County, Pennsylvania. Individually and on behalf of a putative class of Pennsylvania homeowners, plaintiffs Vincent and Linda Papurello ("plaintiffs") allege defendant State Farm Fire and Casualty Co. ("defendant" or "State Farm") violated Pennsylvania law by paying initial amounts under homeowners' insurance policies determined by a two-step procedure. Under that procedure, State Farm made a payment under the first step equal to the amount of estimated replacement costs of materials, taxes, and labor less depreciation.

This opinion addresses: (1) plaintiffs' motion for remand to state court or abstention (ECF No. 15); and (2) defendant's motion to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal

Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (ECF No. 20.)

## II.  PROCEDURAL HISTORY

On July 6, 2015, plaintiffs filed a three-count class action complaint against defendant in the Court of Common Pleas of Allegheny County, Pennsylvania, alleging: (1) individual and class-wide Pennsylvania common law breach of contract claims; (2) individual and class-wide claims under Pennsylvania's insurance bad faith statute, 42 PA. CONS. STAT. § 8371; and (3) individual and class-wide claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (the "CPL"), 73 PA. STAT. §§ 201-1 *et seq.* (ECF No. 1-2.)

On August 3, 2015, defendant removed this putative class action to this court pursuant to 28 U.S.C. §§ 1441 and 1453, asserting traditional diversity jurisdiction under 28 U.S.C. § 1332(a)(1), supplemental jurisdiction under 28 U.S.C. § 1367, and jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). (ECF No. 1 at 1.)

On August 31, 2015, plaintiffs filed an amended complaint against defendant. (ECF No. 10.) In their amended complaint, plaintiffs modified their class definition to include

> [a]ll persons who, since January 1, 2011[:] (a) were policyholders under [defendant's homeowners'] policy which promised replacement cost[;] and (b) incurred covered partial damage to their residence, located in . . . Pennsylvania, for which a claim was accepted . . . [and] a replacement cost for the loss [was] determined by [defendant], but from which replacement cost [defendant] deducted depreciation amounts and taxes.[1]

---

[1] In their state court complaint, plaintiffs set forth the same class definition, less the phrase: "and taxes." *See* (ECF No. 1-2 at 9 ¶ 27.)

(*Id.* at 7–8 ¶ 28.)

On September 2, 2015, plaintiffs filed the instant motion for remand to state court or abstention and a supporting brief. (ECF Nos. 15, 16.) On September 23, 2015, defendant filed a response in opposition to plaintiffs' motion for remand or abstention and a supporting brief. (ECF Nos. 22, 23.)

On September 23, 2015, defendant filed the instant Rule 12(b)(6) motion to dismiss plaintiffs' amended complaint in its entirety and a supporting brief. (ECF Nos. 20, 21.) On October 9, 2015, plaintiffs filed a response in opposition to defendant's Rule 12(b)(6) motion to dismiss and a supporting brief. (ECF Nos. 26, 27.)

On October 29, 2015, the court held a hearing at which the parties argued plaintiffs' motion for remand or abstention and defendant's Rule 12(b)(6) motion to dismiss.

Having been fully briefed and argued, plaintiffs' and defendant's motions are ripe for disposition. For the reasons set forth at the October 29, 2015 hearing and in this opinion, the court will: (1) deny plaintiffs' motion for remand or abstention; and (2) deny in part and grant in part defendant's Rule 12(b)(6) motion to dismiss. Plaintiffs' individual breach of contract and individual statutory bad faith claims shall proceed. Plaintiffs' individual CPL claim and class-wide breach of contract, statutory bad faith, and CPL claims will be dismissed with prejudice for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).

Plaintiffs' motion for remand or abstention presents a threshold question of

subject-matter jurisdiction the court must resolve before addressing defendant's Rule 12(b)(6) motion to dismiss. *Lewis v. Ford Motor Co.*, 610 F. Supp. 2d 476, 480 (W.D. Pa. 2009) ("Because [the court] cannot address [the defendant's Rule 12(b)(6) motion to dismiss] if it does not have [subject-matter] jurisdiction, . . . [the court] begin[s] [its] analysis with [the plaintiff's] [m]otion to [r]emand.").

III. <u>DISCUSSION—PLAINTIFFS' MOTION FOR REMAND OR ABSTENTION</u>

In their motion for remand or abstention, plaintiffs argue: (1) defendant failed to prove federal subject-matter jurisdiction by a preponderance of the evidence; and (2) the court should decline to hear this action pursuant to the abstention principles set forth in *Buford v. Sun Oil Co.*, 319 U.S. 315 (1943). (ECF No. 16.)

Below, the court addresses: (A) the legal standards for and merits of plaintiffs' arguments for remand to state court for lack of federal subject-matter jurisdiction; and (B) the legal standard for and merits of plaintiffs' arguments for *Buford* abstention.

A. <u>Remand to state court for lack of federal subject-matter jurisdiction</u>

Unless expressly precluded by federal statute, a defendant may remove a civil action filed in state court to the federal district court for the district and division embracing the place in which the action pends, provided the federal district court has "original"—*i.e.*, federal subject-matter—jurisdiction with respect to the plaintiff's claims. 28 U.S.C. § 1441(a). If the court lacks federal subject-matter jurisdiction over the plaintiff's claims, the case must be remanded to state court. 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks [subject-matter]

jurisdiction, the case shall be remanded [to state court].").[2]

As stated previously, defendant removed this putative class action from state court to this court asserting: (1) diversity jurisdiction under 28 U.S.C. § 1332(a)(1) and supplemental jurisdiction under 28 U.S.C. § 1367; and (2) CAFA jurisdiction under 28 U.S.C. § 1332(d)(2). (ECF No. 1 at 1.)

For the reasons set forth below, the court concludes defendant established traditional § 1332(a)(1) diversity jurisdiction, § 1367 supplemental jurisdiction, and CAFA jurisdiction over plaintiffs' individual and class-wide claims.

### 1. Traditional diversity and supplemental jurisdiction

Pursuant to 28 U.S.C. § 1332(a)(1), "[f]ederal district courts are vested with original jurisdiction over civil actions" in which: (1) the parties are "'citizens of different States'"; and (2) the "matter in controversy exceeds the sum or value of $75,000," exclusive of interest and costs. *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006) (quoting 28 U.S.C. § 1332(a)(1)). The party asserting § 1332(a)(1) diversity jurisdiction bears the burden of proof by a preponderance of the evidence. *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

If § 1332(a)(1) diversity jurisdiction applies to at least one of plaintiffs' state law claims, the court has discretion to exercise "supplemental jurisdiction" with respect to

---

[2] Because "the nature of [plaintiffs'] claim[s] must be evaluated, and the propriety of remand decided, on the basis of the record as it [stood] at the time [defendant's notice of] removal [was] filed," the court examines plaintiffs' initial state court complaint (ECF No. 1-2)—not its amended complaint filed after removal (ECF No. 10)—in resolving the instant motion for remand. *Westmoreland Hosp. Ass'n v. Blue Cross of W. Pa.*, 605 F.2d 119, 123 (3d Cir. 1979) (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939)).

claims not within the court's original jurisdiction, provided the claims are "so related" they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §§ 1367(a), (c); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966) (holding supplemental jurisdiction is appropriate where state law claims share a "common nucleus of operative fact" with claims falling within the court's original jurisdiction). Section 1367 authorizes supplemental jurisdiction over putative class members' claims if "at least one named plaintiff" satisfies § 1332(a)(1)'s $75,000 amount in controversy requirement and complete diversity is present. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005).

Each requirement for § 1332(a)(1) diversity jurisdiction and § 1367 supplemental jurisdiction is addressed in turn below.

a.      **Complete diversity under § 1332(a)(1)**

Traditional diversity jurisdiction under § 1332(a)(1) requires complete diversity of citizenship—*i.e.*, all plaintiffs must be of diverse citizenship from all defendants. *Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806). Citizenship of natural persons is "synonymous with domicile, and 'the domicile of an individual is his true, fixed and permanent home and place of habitation.'" *McCann*, 458 F.3d at 286 (quoting *Vlandis v. Kline*, 412 U.S. 441, 454 (1973)). "[A] corporation," on the other hand, "shall be deemed . . . a citizen of every [s]tate . . . by which it has been incorporated *and* of the [s]tate . . . where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (emphasis added). "'[P]rincipal place of business'"—as used in § 1332(c)(1)—refers to a corporation's "'nerve center'"—*i.e.*, "normally . . . the place where the corporation maintains its

headquarters. . . ." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).

In their state court complaint, the named plaintiffs allege they are "adult citizens of . . . Pennsylvania" residing in Pittsburgh. (ECF No. 1-2 at 4 ¶ 1.) During the October 29, 2015 hearing, the named plaintiffs conceded they are domiciled in Pennsylvania. Plaintiffs defined their putative class as including only Pennsylvania homeowners and conceded at the October 29, 2015 hearing that putative class members are Pennsylvania citizens. Defendant, therefore, proved by a preponderance of the evidence that plaintiffs and putative class members are Pennsylvania citizens for purposes of § 1332(a)(1).

Defendant included with its notice of removal the declaration of Lyle Rudin ("Rudin")—defendant's "[a]ssistant [s]ecretary-[t]reasurer—in which Rudin swore defendant is an "Illinois corporation organized and existing under the laws of Illinois," with its "principal place of business" and "corporate headquarters" in Illinois. (ECF No. 1-4 at 1–2 ¶¶ 2–3.) Plaintiffs did not adduce evidence challenging defendant's Illinois citizenship in their submissions to the court or at the October 29, 2015 hearing. In their state court complaint, plaintiffs allege expressly that defendant is a "foreign insurance company" with its "home office in Bloomington, Illinois." (ECF No. 1-2 at 5 ¶ 2.) Defendant, therefore, proved by a preponderance of the evidence that it is an Illinois citizen for purposes of § 1332(a)(1).

Because defendant proved by a preponderance of the evidence that all named plaintiffs and putative class members are of diverse citizenship from defendant, complete diversity is satisfied. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) ("Complete diversity requires that . . . no plaintiff be a citizen of the same state

as any defendant.").

**b.    Amount in controversy under § 1332(a)(1)**

To satisfy § 1332(a)(1) with respect to the named plaintiffs' claims, defendant must prove by a preponderance of the evidence that the named plaintiffs allege an amount in controversy in excess of $75,000, exclusive of interest and costs.

In this action, the named plaintiffs allege $28,682.41 in individual compensatory damages in the form of unpaid insurance benefits—*i.e.*, the difference between $32,500.00 of damage to their home (less the $1000.00 insurance policy deductible) and the $2,817.59 payment plaintiffs received from defendant. *See* (ECF No. 1-2 at 6–7 ¶¶ 13–15). In addition, the named plaintiffs seek individual punitive damages under Pennsylvania's bad faith insurance statute, 42 PA. CONS. STAT. § 8371. (ECF No. 1-2 at 17 ¶ 53.) Pennsylvania courts have approved § 8371 punitive damages awards of four to five times the amount of compensatory damages. *Grossi v. Travelers Pers. Ins. Co.*, 79 A.3d 1141, 1160–61 (Pa. Super. Ct. 2013); *Davis v. Fidelity Nat'l Ins. Co.*, 32 Pa. D. & C. 5th 179, 2013 WL 10230561, at *12 (Pa. Ct. Com. Pl. Aug. 15, 2013). Four to five times $28,682.41 (*i.e.*, plaintiffs' alleged compensatory damages) exceeds § 1332(a)(1)'s $75,000 amount in controversy requirement. Defendant, therefore, proved by a preponderance of the evidence that the amount in controversy alleged in the named plaintiffs' individual claims exceeds $75,000, exclusive of interest and costs, as required under § 1332(a)(1).

**c.    Supplemental jurisdiction under § 1367**

As stated, 28 U.S.C. § 1367 authorizes supplemental jurisdiction over putative

class members' claims arising out of the same Article III "case or controversy" if "at least one named plaintiff" satisfies § 1332(a)(1)'s $75,000 amount in controversy requirement and complete diversity is present. *See Exxon Mobil Corp.*, 545 U.S. at 549, 554 ("Incomplete diversity destroys original jurisdiction, . . . so there is nothing to which supplemental jurisdiction can adhere.").

As set forth *supra*, the court concluded defendant proved by a preponderance of the evidence that: (1) the named plaintiffs allege an amount in controversy exceeding $75,000, exclusive of interest and costs; and (2) all named plaintiffs and putative class members are diverse from defendant, thus satisfying § 1332(a)(1)'s complete diversity requirement. The court, therefore, "has original jurisdiction over [this] civil action" under § 1332(a)(1) and "can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action." *Exxon Mobil Corp.*, 545 U.S. at 559.

The court concludes § 1367 supplemental jurisdiction is appropriate in this action. The named plaintiffs and putative class members entered into the identical State Farm homeowners' insurance policy in issue, suffered partial damage to their Pennsylvania residences, and received initial payment estimations from defendant equaling replacement cost less depreciation. Putative class members' claims, therefore, arise out of the same "case or controversy" as, and share a "common nucleus of operative fact with, the named plaintiffs' claims. 28 U.S.C. § 1367(a); *Gibbs*, 383 U.S. at 725. Consequently, the court will exercise its discretion under § 1367 to hear putative class members' claims, in addition to the named plaintiffs' claims.

Because the court concludes it has diversity and supplemental jurisdiction over plaintiffs' individual and class-wide claims, plaintiffs' motion for remand or abstention will be denied, insofar as plaintiffs assert insufficient federal subject-matter jurisdiction.

## 2.  CAFA jurisdiction under § 1332(d)(2)

Even in the absence of diversity and supplemental jurisdiction, the court has federal subject-matter jurisdiction over plaintiffs' claims pursuant to CAFA, 28 U.S.C. § 1332(d). CAFA provides, in relevant part, that

> [t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action[3] in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant. . . .

28 U.S.C. § 1332(d)(2)(A). As the "party asserting federal [subject-matter] jurisdiction in [this] removal case," defendant bears the burden of proving the case is "properly before the federal court." *Frederico v. Home Depot*, 507 F.3d 188, 193 (3d Cir. 2007) (citing *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004)); *Morgan v. Gay*, 471 F.3d 469, 473 (3d Cir. 2006). "This includes the burden of establishing that all three criteria of CAFA are met, *i.e.*, [minimal] diversity of citizenship, [an] amount in controversy [exceeding] $5,000,000, and a class size of at least [one hundred] members." *Lewis*, 610 F. Supp. 2d at 480 (citing *Frederico*, 507 F.3d at 193).

Defendant adduced evidence sufficient to prove: (a) minimal diversity of

_____

[3] CAFA defines a "class action" as "any civil action filed under [R]ule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by [one] or more representative persons as a class action. . . ." 28 U.S.C. § 1332(d)(1)(B).

citizenship; (b) an amount in controversy exceeding $5,000,000; and (c) a class size of at least one hundred members, as required under CAFA. Each CAFA requirement is addressed in turn below.

### a.    CAFA's minimal diversity of citizenship requirement

"Pursuant to CAFA, federal courts have jurisdiction over class actions in which . . . any class member and any defendant are citizens of different states. . . ." *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 149 (3d Cir. 2009) (citing 28 U.S.C. § 1332(d)(2)(A)); *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1348 (2013) (stating CAFA requires that "the parties are minimally diverse"). "Citizenship of the members of the proposed plaintiff classes shall be determined . . . as of the date of filing of the complaint" in state court. 28 U.S.C. § 1332(d)(7); *cf. Westmoreland Hosp. Ass'n*, 605 F.2d at 123.

As stated previously, defendant proved *complete* diversity among the parties, as the named plaintiffs and putative class members are Pennsylvania citizens and defendant is an Illinois citizen. Defendant, therefore, also proved *minimal* diversity of the parties by a preponderance of the evidence, as required under CAFA. *Kaufman*, 561 F.3d at 149 (noting CAFA requires minimal diversity—*i.e.*, a showing that "any class member and any defendant are citizens of different states. . . ." (citing 28 U.S.C. § 1332(d)(2)(A))).

### b.    CAFA's amount in controversy requirement

"Pursuant to CAFA, federal courts have jurisdiction over class actions in which the amount in controversy exceeds [the sum or value of] $5,000,000," exclusive of interest and costs. *Kaufman*, 561 F.3d at 149 (citing 28 U.S.C. §§ 1332(d)(2)). "To

'determine whether [CAFA's] matter in controversy' exceeds [the] sum [or value of $5,000,000, exclusive of interest and costs], 'the claims of the individual class members shall be aggregated.'" *Knowles*, 133 S. Ct. at 1348 (quoting 28 U.S.C. § 1332(d)(6)). "[T]hose 'class members' include 'persons (named or unnamed) who fall within the definition of the *proposed* or certified class.'" *Id.* (quoting 28 U.S.C. § 1332(d)(1)(D)) (emphasis in original).

With its notice of removal and response in opposition to plaintiffs' motion for remand or abstention, defendant submitted evidence—uncontroverted by plaintiffs—sufficient to show plaintiffs' state court complaint alleges an aggregate sum or value exceeding $5,000,000, exclusive of interest and costs, as required under CAFA.

In their state court complaint, plaintiffs alleged, *inter alia*, breach of contract claims seeking class-wide damages in the form of unpaid depreciation deductions under their homeowners' insurance policies. *See* (ECF No. 1-2 at 16 (stating plaintiffs' breach of contract claim seeks class-wide relief in the form of "non-payment [*sic*] of contract benefits").) Plaintiffs alleged a putative class consisting of "[a]ll persons" who, "since January 1, 2011": (1) agreed to defendant's Pennsylvania "replacement cost" homeowners' insurance policy; (2) incurred covered partial damage to their Pennsylvania residences; and (3) received replacement cost payment estimations less depreciation. *See* (ECF No. 1-2 at 9 ¶ 27.) Defendant submitted the declarations of Jaun L. Guevara, Jr. ("Guevara")—defendant's "[c]laim [c]onsultant—in which Guevara swore he applied plaintiffs' class definition to defendant's claims data through its "software vendor, Xactware, Inc.," to conclude that

*for the year 2014 alone*, which is the year of [plaintiffs'] alleged loss, there were more than 16,000 estimates uploaded to [defendant's electronic structural damage estimating software] for homeowners' structural damage claims in Pennsylvania that showed a deduction for depreciation. . . . [This data reflected a] total amount of depreciation deductions . . . [of] over $30,000,000. . . . [E]ven if one were to exclude [the seventy-four claims for total loss, as opposed to claims for partial loss like the claim alleged in plaintiffs' state court complaint], there still would be around 16,000 remaining [c]laims for 2014 alone[,] . . . [a]nd the total amount of depreciation deductions reflected . . . for those remaining claims—in 2014 alone—was approximately $27,000,000. . . .

(ECF No. 23-1 at 2–4 (emphasis added); ECF No. 1-5.)

Beyond criticizing the calculations in Guevara's declarations as "guesstimate[s]," plaintiffs fail to adduce proof rebutting defendant's evidence that *in just one year* of the class period—which spans from "January 1, 2011" to the present—defendant deducted approximately "$27,000,000" in depreciation form partial home loss payments involving putative class members. (ECF No. 16 at 4; ECF No. 23-1 at 3–4.) Defendant, therefore, proved by a preponderance of the evidence that plaintiffs' claims seek more than $5,000,000 in damages in the form of depreciation deductions, which satisfies CAFA's amount in controversy requirement.

### c.    CAFA's class-size requirement

CAFA does not apply if the "number of members of all proposed plaintiff classes in the aggregate is less than [one hundred]." 28 U.S.C. § 1332(d)(5)(B); *Kaufman*, 561 F.3d at 149 (noting CAFA requires "at least [one hundred] members in the putative class").

As stated previously, Guevara's declarations provide that defendant "uploaded around 16,000 . . . [c]laims for 2014 alone" in which Pennsylvania homeowners'

policyholders (*i.e.*, putative class members) claimed partial damage to their residence and received replacement cost estimates less depreciation. (ECF No. 23-1 at 2–4.) Beyond bare criticism, plaintiffs fail to rebut defendant's computations. In their state court complaint, plaintiffs allege specifically that "[u]pon information and belief, there are approximately 700,000 State Farm policyholders with [homeowners'] insurance in Pennsylvania[,] a significant number of whom would be expected to have had [insurance] claims [with defendant] within the proposed class period. . . ." (ECF No. 1-2 at 9 ¶ 28.) Based upon the foregoing analysis, the court concludes defendant proved by a preponderance of the evidence that plaintiffs' putative class consists of at least one hundred members, as required under CAFA.

Because defendant adduced evidence sufficient to prove: (a) minimal diversity of citizenship; (b) an amount in controversy exceeding $5,000,000; and (c) a class size of at least one hundred members, the court concludes defendant proved CAFA jurisdiction with respect to plaintiffs' claims.[4] As stated *supra*, the court will deny plaintiffs' motion

---

[4] In their motion for remand, plaintiffs allege the "issues raised [in their state court complaint] are uniquely local, affecting matters of state concern and prerogative and only Pennsylvania homeowners." (ECF No. 15 at 1 ¶ 4.b.) Insofar as plaintiffs argue for CAFA's "local controversy exception," the court concludes their argument is without merit.

Under CAFA's "local controversy" exception, a federal court "must decline jurisdiction if . . . a [supermajority] of the members of the putative class *and at least one significant defendant* are from the state in which the class action was originally filed." *Kaufman*, 561 F.3d at 148 (citing 28 U.S.C. § 1332(d)(4)(A)) (emphasis added). The evidence establishes defendant is a citizen of Illinois—not Pennsylvania, the "state in which [plaintiffs'] class action was originally filed." *Id.* State Farm is the only defendant in this action. There are no additional defendants, let alone a "significant defendant" from Pennsylvania. For these reasons, CAFA's "local controversy" exception does not provide grounds for remand to state court in this putative class action.

for remand or abstention, insofar as plaintiffs assert insufficient federal subject-matter jurisdiction.

## B. *Buford* abstention

In their motion for remand or abstention, plaintiffs argue the court should decline to hear this putative class action under *Buford* because "Pennsylvania should be allowed to continue the development of acceptable insurance claim procedure[s] consistent with its law and not have unacceptable practices continue within [Pennsylvania] by development of inconsistent precedent outside [Pennsylvania's] own system." (ECF No. 16 at 5.)

*Buford* abstention is inappropriate in this action, with respect to which the court has federal subject-matter jurisdiction. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) ("Federal courts have a strict[—but not absolute—]duty to exercise the jurisdiction . . . conferred upon them by Congress" (citing cases)). "[I]n *extraordinary* circumstances," *Buford* permits a federal court

> to dismiss a case only if it presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or if its adjudication in a federal forum "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Id.* at 726–27 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)) (emphasis added). Importantly, "*Burford* is concerned with protecting complex state *administrative* processes from undue federal influence. . . ." *New Orleans Pub. Serv., Inc.*, 491 U.S. at 362 (emphasis added).

This putative class action is a "[s]imple" Pennsylvania "contract . . . action[]" filed by private parties "that happen[s] to involve an . . . insurance company." *See Grode v. Mut. Fire, Marine & Inland Ins. Co.*, 8 F.3d 953 (3d Cir. 1993). Plaintiffs' claims do not implicate or affect "matters of important [Pennsylvania] regulatory concern[,] . . . complex [Pennsylvania] interests," or "complex and highly regulated issues of [Pennsylvania] insurance regulation." *Id.*

The court's resolution of the parties' insurance policy dispute will not "[disrupt] . . . [Pennsylvania's] efforts to establish a coherent policy" with respect to homeowners' insurance payments. *Quackenbush*, 517 U.S. at 726–27 (quoting *New Orleans Pub. Serv., Inc.*, 491 U.S. at 361). The court's judgment will bind only the parties; it will not bind Pennsylvania courts or federal courts applying Pennsylvania law. *Cf. Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7 (2011) ("'A decision of a federal district court . . . is not binding precedent in either a different judicial district, the same judicial district, or even upon the same [district] judge in a different case.'" (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.02(1)(d) (3d ed. 2011))). The court, therefore, declines to invoke *Buford* abstention with respect to this case.

For the foregoing reasons, plaintiffs' motion for remand or abstention will be denied. In light of the court's jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1332(a)(1), 1367, and 1332(d), the court addresses the merits of defendant's Rule 12(b)(6) motion to dismiss plaintiffs' amended complaint.

## IV.   DISCUSSION—DEFENDANT'S RULE 12(B)(6) MOTION TO DISMISS

In its Rule 12(b)(6) motion to dismiss, defendant argues plaintiffs' amended

complaint fails to allege facts supporting plausible individual and class-wide Pennsylvania[5] breach of contract, statutory bad faith, and CPL claims against it. The court addresses in turn: (A) plaintiffs' factual allegations; (B) Rule 12(b)(6)'s legal standard; and (C) whether plaintiffs state plausible individual and class-wide claims against defendant under Pennsylvania law.

## A.    Plaintiffs' factual allegations

The court draws the facts from plaintiffs' amended complaint (ECF No. 10), relevant portions of the insurance policy in issue (ECF No. 10-1), and defendant's May 13, 2015 replacement cost estimate.[6] (ECF No. 21-1.) In deciding defendant's Rule

---

[5] In diversity actions, a federal district court applies substantive state law and the choice-of-law principles of the state in which its sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). In this case, the parties do not dispute Pennsylvania law governs this action.

[6] Federal Rule of Civil Procedure 12(d) ("Rule 12(d)") provides that "[i]f, on a motion under Rule 12(b)(6), . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under [Federal] Rule [of Civil Procedure] 56." In light of Rule 12(d), the United States Court of Appeals for the Third Circuit has observed that "[in] decid[ing] a [Rule 12(b)(6)] motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1357, at 299 (2d ed. 1990)). In addition, the court "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a [Rule 12(b)(6)] motion to dismiss if the plaintiff's claims are based on the document." *Id.*

In ruling on defendant's Rule 12(b)(6) motion to dismiss, the court considers the parties' insurance policy because plaintiffs attached it as an exhibit to their amended complaint. *See* (ECF No. 10-1); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196 ("To decide a [Rule 12(b)(6)] motion to dismiss, courts . . . [may] consider . . . exhibits attached to the complaint. . . .).

With respect to defendant's May 13, 2015 replacement cost estimate document: (1) the parties did not dispute the document's authenticity at the October 29, 2015 hearing or in

12(b)(6) motion to dismiss, the court accepts as true the well-pleaded factual allegations in plaintiffs' amended complaint. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

Plaintiffs are "adult citizens of . . . Pennsylvania" residing in Pittsburgh. (ECF No. 10 at 3 ¶ 1.) Defendant is an "insurance company" with its "home office in Bloomington, Illinois." (*Id.* at 3 ¶ 2.) Defendant is "authorized to and does issue [homeowners'] insurance policies within Pennsylvania." (*Id.*)

Plaintiffs "purchased a [h]omeowners [p]olicy of insurance" from defendant—"policy form FP-7955 and policy number 38-BE-0574-9"—that was "renewed yearly and is currently in effect" (the "Policy"). (*Id.* at 4 ¶ 5; ECF No. 10-1 at 1.) Plaintiffs' "private residence . . . is identified as the subject of [the Policy]." (ECF No. 10 at 4 ¶ 6.) Pursuant to the Policy, defendant insured plaintiffs' residence against "accidental direct physical loss" up to $515,500.00. (ECF No. 10-1 at 1, 10.)

In the event of partial damage to plaintiffs' residence, the Policy's two-step "[r]eplacement [c]ost [l]oss [s]ettlement" procedure applied. *See* (ECF No. 10 at 12–13 ¶¶ 40–41.) The two-step replacement cost procedure provides, in relevant part:

    a.     [Defendant] will pay the cost to repair or replace with similar

---

their submissions to the court; (2) defendant attached the document as an exhibit to its Rule 12(b)(6) motion to dismiss; and (3) plaintiffs' claims are based on the document, as it sets forth the itemized list and aggregated amount of depreciation deducted from replacement cost to arrive at plaintiffs' step-one "actual cash value at the time of the loss" payment. (ECF No. 21-1.) For these reasons, the court considers defendant's May 13, 2015 replacement cost estimate in resolving the instant Rule 12(b)(6) motion to dismiss. (ECF No. 21-1); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196.

construction and for the same use on the premises . . . the damaged part of the property covered under [the Policy], . . . subject to the following:

> (1)    until actual repair or replacement is completed, [defendant] will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the [Policy], not to exceed the cost to repair or replace the damaged part of the property;

> (2)    when the repair or replacement is actually completed, [defendant] will pay the covered additional amount [plaintiffs] actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the [Policy], whichever is less.

(ECF No. 10-1 at 14.) "To receive any additional payments on a replacement cost basis," plaintiffs were required to "complete the actual repair or replacement of the damaged part of the property within two years after the date of loss."[7] (*Id.*)

Plaintiffs "selected" the Policy because it "promised replacement cost" for "damage to their residence." (ECF No. 10 at 4 ¶ 7, 14 ¶ 45.) The Policy had "no express provision[s]": (1) prescribing "the manner [for] calculating actual cash value"; (2) authorizing defendant to "deduct[] . . . taxes [and] depreciation" from payments; or (3) allowing defendant "to compute actual cash value by taking depreciation on labor expenses or taxes." (*Id.* at 14 ¶¶ 46–49.) Consequently, plaintiffs expected "replacement cost coverage would not be altered, changed or reduced" by defendant in the event of

---

[7] The effect of the two-step loss provision was to make actual repair or replacement of the damage to plaintiffs' residence a necessary precondition for recovery on a replacement cost basis. *Cf. Dickler v. CIGNA Prop. & Cas. Co.*, 957 F.2d 1088, 1095 (3d Cir. 1992).

damage to their residence. (*Id.* at 13 ¶ 43.)

The Policy was "in full force and effect when a storm caused damage to the roof of [p]laintiffs' residence." (*Id.* at 4 ¶ 8.) Plaintiffs "were unaware of the damage until recently . . . but immediately reported the claim to [defendant]." (*Id.*) Defendant "inspected the damage to the residence on or about May 6, 2015 and recorded in its written computation of the replacement cost of the damage . . . that the damage occurred on July 8, 2014." (*Id.* at 4 ¶ 9; ECF No. 21-1 at 4.)

On May 13, 2015, defendant "accepted" plaintiffs' "claim for storm damage as covered accidental direct physical damage" to their residence. (ECF No. 10 at 4 ¶ 10.) Defendant "determined the replacement cost to be $4,145.27," but "refuse[d] to pay that amount" to plaintiffs. (*Id.*) "Instead," defendant "deducted taxes expected on the replacement cost of the damaged property and calculated the actual cash value . . . by taking depreciation on the replacement cost of [plaintiffs'] damaged residence." (*Id.* at 4–5 ¶ 11); *see* (ECF No. 21-2 at 4 (subtracting from replacement cost value $327.68 in "[d]epreciation ([i]ncluding [t]axes)" to arrive at actual cash value).) Defendant's "method for actual cash value calculation included depreciating non-depreciable components of the repair or replacement cost" (*i.e.*, taxes and labor) and "withholding both the inflated depreciation and part of the taxes." (ECF No. 10 at 4–5 ¶ 11.) Using this method, defendant "deducted and withheld part of the taxes and the depreciation amount"—which "totaled $327.68"—from "the replacement cost of the damaged property . . . of $4,145.27 and also deducted [the] $1,000 [P]olicy deductible." (*Id.* at 5 ¶ 12); *see* (ECF No. 21-2 at 4.) Defendant "tendered the remainder, $2,817.59, to

[p]laintiffs, which [defendant] represented was the actual cash value of the damaged property." (ECF No. 10 at 5 ¶ 13); *see* (ECF No. 21-2 at 4 ("[n]et [a]ctual [c]ash [v]alue [p]ayment[:] $2,817.59").) This remainder, however, "was not the actual cash value" of the damage to plaintiffs' residence, "as [defendant] computed [the payment] pursuant to a scheme to intentionally decrease actual cash value." (ECF No. 10 at 5 ¶ 13.)

After defendant inspected plaintiffs' residence on May 6, 2015, "an independent contractor inspected the damage to [plaintiffs'] residence at [plaintiffs'] request" and "determined the replacement cost to be $32,500." (*Id.* at 5 ¶ 14.) Plaintiffs "requested" that defendant "accept[]" the independent contractor's $32,500.00 estimate and pay the "withheld depreciation[,] including taxes," but defendant refused. (*Id.* at 5 ¶ 15.) "[T]hough [p]laintiffs wished to proceed with replacement construction, [defendant] . . . provided only $2,817.59 with which to undertake $32,500 of replacement construction." (*Id.* at 5 ¶ 16.) Consequently, plaintiffs filed this action.

### B. Rule 12(b)(6) standard

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the allegations in the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a Rule 12(b)(6) motion to dismiss, the court does not opine whether plaintiffs are likely to prevail on the merits; rather, the court accepts as true all well-pleaded factual allegations and views them in a light most favorable to plaintiffs. *U.S. Express Lines Ltd.*, 281 F.3d at 388. While plaintiffs need not set forth detailed factual allegations in their amended complaint to survive defendant's Rule 12(b)(6) motion to dismiss, they must provide more than mere labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.*

(citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). "Factual allegations must be

enough to raise a right to relief above the speculative level" and "sufficient to state a

claim for relief that is plausible on its face." *Id.* "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Twombly*, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it
> asks for more than a sheer possibility that a defendant has acted unlawfully.
> . . . Where a complaint pleads facts that are "merely consistent with" a
> defendant's liability, it "stops short of the line between possibility and
> plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556).

Two working principles underlie *Twombly. Id.* First, with respect to mere

conclusory statements, a court need not accept as true all the allegations contained in a

complaint. "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Second, to

survive a Rule 12(b)(6) motion to dismiss, a claim must state a plausible claim for relief.

*Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be

a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Id.* "But where the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged—but it has

not 'show[n]—that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)(2)).

A court considering a Rule 12(b)(6) motion to dismiss may begin by identifying

pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.*

Finally, the court may grant plaintiffs leave to amend their complaint under Federal Rule of Civil Procedure 15 ("Rule 15"), which provides that the court "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15. Rule 15, however, does not permit amendment when it would be futile. Futility "'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *Kenny v. United States*, Civ. A. No. 10-4432, 2012 WL 2945683, at *4 (3d Cir. July 19, 2012) (citing *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 231 (3d Cir. 2011)). "The standard for deciding whether claims are futile for the purpose of granting leave to amend a complaint is the same as a motion to dismiss." *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 771 (E.D. Pa. 2011). "[I]f the court determines that [the] plaintiff has had multiple opportunities to state a claim but has failed to do so, leave to amend may be denied." *See* 6 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 2010).

## C. <u>Whether plaintiffs state plausible claims against defendant</u>

As stated previously, plaintiffs allege: (1) individual and class-wide Pennsylvania common law breach of contract claims; (2) individual and class-wide claims under

Pennsylvania's insurance bad faith statute, 42 PA. CONS. STAT. § 8371; and (3) individual and class-wide claims under Pennsylvania's CPL, 73 PA. STAT. §§ 201-1 *et seq.* (ECF No. 1-2.) The court addresses the plausibility of each of plaintiffs' individual and class-wide claims in turn.

### 1. Plaintiffs' individual and class-wide breach of contract claims

In their amended complaint, plaintiffs allege: (a) an individual breach of contract claim; and (b) a class-wide breach of contract claim premised upon two alternative theories.

### a. Plaintiffs' individual breach of contract claim

Individually, plaintiffs allege defendant refused to pay for covered damage to their residence in the amount of $32,500.00, in violation of the Policy. Because the parties dispute whether the estimated replacement cost of the damage to plaintiffs' roof is $32,500.00 or $4,145.27, the court concluded at the October 29, 2015 hearing that regardless whether depreciation was properly deducted from the first step payment under the Policy, plaintiffs state a plausible individual breach of contract claim against defendant under Pennsylvania law.

### b. Plaintiffs' class-wide breach of contract claim

Plaintiffs' class-wide breach of contract allegations concern whether depreciation may be deducted from estimated replacement costs in the first step of the payment process under the Policy and, if so, whether taxes and labor may be included in the estimated costs of repair or replacement from which depreciation is taken to reduce the amount paid under the Policy's first step. Specifically, on behalf of a putative class of

Pennsylvania homeowners, plaintiffs allege: (i) defendant breached a contractual duty imposed by the *express* Policy term "actual cash value"; or (ii) in the alternative, defendant breached the *implied* contractual duty of good faith and fair dealing in the Policy. The court addresses each alternative class-wide breach of contract theory in turn.

### i. Breach of the express term "actual cash value"

"[T]o support a claim for breach of contract" under Pennsylvania law, plaintiffs "must plead: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damage." *Kane v. State Farm Fire & Cas. Co.*, 841 A.2d 1038, 1042 (Pa. Super. Ct. 2003). With respect to whether depreciation may be used to reduce the amount paid under the Policy's first step and whether taxes and labor costs may be included in the costs of repair or replacement from which depreciation is subtracted, the parties dispute only whether plaintiffs allege a plausible "breach of a duty imposed" upon defendant "by the [Policy]" and Pennsylvania law. *See id.*

In their amended complaint, plaintiffs allege that under Pennsylvania law, the express term "actual cash value" in a homeowners' insurance policy "requires payment of the replacement cost[8] of the damage to the [plaintiffs'] residence *without* deduction[s] for depreciation." (ECF No. 10 at 2 (emphasis added).) On behalf of a putative class, plaintiffs allege defendant breached the express Policy term "actual cash value" by

---

[8] "Replacement cost"—as used by the parties and the court in this opinion—is defined as the "covered additional amount [the insureds] actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the [Policy], *whichever is less*." (ECF No. 10-1 at 14 (emphasis added).) Replacement cost, therefore, cannot exceed the Policy's liability limits.

estimating class members' replacement costs reflective of materials, taxes, and labor and subtracting depreciation from that amount. The court addresses, in turn: (x) deducting an amount equal to depreciation; and (y) the inclusion of taxes and labor in the estimated amount of costs for repair or replacement before depreciation is subtracted.

### (x).     Deducting an amount equal to depreciation

On behalf of a putative class, plaintiffs allege that under Pennsylvania law, the express Policy term "actual cash value" entitles them to full, upfront "replacement cost" payments for partial damage to their homes—not payments for replacement cost *less* depreciation.

In its Rule 12(b)(6) motion to dismiss, defendant argues Pennsylvania law allows it to subtract depreciation from step-one "actual cash value at the time of the loss" payments made pursuant to the particular two-step Policy issued to plaintiffs.

Based upon the principles of indemnity, Pennsylvania Supreme and Superior Court precedent, and the Policy's plain language, the court concludes defendant did not breach the Policy by subtracting depreciation from replacement cost to arrive at step-one payments. For these reasons, the court will dismiss plaintiffs' class-wide depreciation-based breach of contract claim, pursuant to Pennsylvania law and Rule 12(b)(6).

Plaintiffs' allegations call upon the court to interpret and define the Policy language "actual cash value at the time of the loss." Under Pennsylvania law, insurance policy interpretation is a matter of law for the court. *See Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014). The "goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the

language of the specific policy." *Id.* (citing *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)); *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) ("The polestar of [the court's] inquiry . . . is the language of the insurance policy."). "When the language of an insurance policy is plain and unambiguous, [the] court is bound by that language." *St. John*, 106 A.3d at 14. "Alternatively, if an insurance policy contains an ambiguous term, 'the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.'" *Id.* (quoting *401 Fourth St., Inc.*, 879 A.2d at 171). "Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning." *Id.* (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001)). "Finally, the language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety." *Id.* (citing *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997)); *Madison Constr. Co.*, 735 A.2d at 108 (observing the court "may inform [its] understanding of [insurance policy] terms by considering their dictionary definitions").

Deductions for depreciation from payments made under property insurance policies stem from principles of indemnity.

> The calculation of the proceeds to which the insured is entitled for a covered loss under a property insurance policy is controlled by the principle of indemnity. The goal of indemnity is to reimburse the insured *for the loss sustained—and no more*. The objective is to put the insured in the position the insured would have occupied had no loss occurred. The insured is not entitled to recover more than the damaged property is worth [at the time of the loss]. . . .

ROBERT H. JERRY, II & DOUGLAS R. RICHMOND, UNDERSTANDING INSURANCE LAW 662 (4th ed. 2007) [hereinafter JERRY & RICHMOND] (emphasis added); *McAnarney v. Newark Fire Ins. Co.*, 159 N.E. 902, 904 (N.Y. 1928) ("Indemnity is the basis and foundation of all insurance law." (citing *Wash. Mills Emery Mfg. Co. v. Weymouth & Braintree Mut. Fire Ins. Co.*, 135 Mass. 503, 506–07 (Mass. 1883))). Because "depreciation" is defined in the insurance context as value diminution caused by "physical deterioration" of the property from "'age and physical wear and tear,'" property insurers frequently subtract depreciation from payments for covered losses, ostensibly so as not to enrich the insured.[9] *See Dickler*, 957 F.2d at 1098 (quoting Wendy Evans Lehmann, *Depreciation as factor in determining actual cash value for partial loss under insurance policy*, 8 A.L.R. 4th 533 (1981) [hereinafter Lehman] ("Especially, where the property, if [repaired] or replaced, would be more valuable than that destroyed, because of the age or condition before [the] loss of the property, deduction has frequently been made for . . . depreciation or deterioration.")). Depreciation deductions, therefore, align generally with indemnity's aim "to reimburse the insured for the loss sustained"—"no more, no less."[10] *See Redcorn v. State Farm Fire & Cas. Co.*, 55 P.3d 1017, 1023 (Okla.

---

[9] In its May 13, 2015 replacement cost estimate, defendant defined "[d]epreciation" as the "decrease in the value of property over a period of time due to wear, tear, condition, and obsolescence." (ECF No. 21-1 at 3.)

[10] The following hypothetical illustrates the nexus between indemnity and depreciation. If the insured purchases property with a useful life of five years for $100,000, insures it under an indemnity policy, and uses the property for two years, the property's value will depreciate to $60,000 in light of two years of use. If, in year two, a contingency destroys the property, the insurer must "put the insured in the position [she] *would have* occupied

2002) (Boudreau, J., dissenting); *Burton v. Republic Ins. Co.*, 845 A.2d 889, 896 (Pa. Super. Ct. 2004) ("Since insurance policies are based on principles of indemnity rather than enrichment, claimants should not be permitted to exploit their losses and use them as an opportunity to remodel their homes at the insurer's expense." (citing *Ins. Co. of N. Am. v. Alberstadt*, 119 A.2d 83, 83–86 (Pa. 1956))).

Notwithstanding that depreciation deductions align generally with indemnity's aim, the Pennsylvania Supreme Court made clear in 1930 that where a property insurer promises the insured only *one payment* of "actual cash value," the insured is entitled to *full* replacement cost without any deduction for depreciation. *Fedas v. Ins. Co. of State of Pa.*, 151 A. 285, 288 (Pa. 1930) ("'[A]ctual cash value' means . . . the real value to replace."). Twenty-two years later, the Pennsylvania Supreme Court reaffirmed *Fedas'* general rule, but instructed that property insurers may "avoid in the future the impact" of *Fedas* by more clearly defining "actual cash value" in their single-step payment policies. *See Farber v. Perkiomen Mut. Ins. Co.*, 88 A.2d 776, 779 (Pa. 1952). In interpreting *Farber*'s instruction, the Pennsylvania Superior Court held in 1997 that an insurer promising only *one payment* of "actual cash value" does not violate *Fedas* if it defines the term in the policy as replacement cost less depreciation. *London v. Ins. Placement*

---

had no loss occurred" under the indemnity policy. JERRY & RICHMOND, *supra*, at 662 (emphasis added). "[H]ad no loss occurred" in this hypothetical, the insured would possess property worth $60,000. The insurer is, therefore, obligated only to return the insured to that economic position under indemnity principles. If the insurer pays the insured an amount *greater* than the property's actual depreciated $60,000 value at the time of its loss, the insured is placed in a better economic position than she was before the loss occurred—*i.e.*, she is enriched by virtue of her loss and the resulting insurance payment.

*Facility of Pa.*, 703 A.2d 45, 50 (Pa. Super. Ct. 1997) (*en banc*), *appeal denied*, 719 A.2d 747 (Pa. 1998). Critically, *Fedas*, *Farber*, and *London* interpreted the term "actual cash value" in policies setting forth *single*-step payment procedures, under which the insurer agreed to make only *one payment* of "actual cash value"—not an initial "actual cash value at the time of the loss" payment followed by an additional payment for full "replacement cost," like the Policy at issue in the instant case.

Where a *two*-step replacement cost payment process is in issue, Pennsylvania case law evidences a growing acceptance of depreciation deductions from step-one "actual cash value at the time of the loss" payments—provided the insured is made whole ultimately with an additional payment at step two causing the total amount of payments to equal the full replacement costs. *Kane v. State Farm Fire & Cas. Co.*, 841 A.2d 1038 (Pa. Super. Ct. 2003), *appeal denied*, 871 A.2d 192 (Pa. 2005). In *Kane*, the Pennsylvania Superior Court interpreted the phrase "actual cash value at the time of the loss" in the *identical* State Farm Policy in issue in the instant case. *See id.* at 1040–41, 1042 ("At the core of this present dispute is the meaning of the phrase 'actual cash value,' as used [in, *inter alia*, the Policy]. . . ."). In *Kane*, the Policy provided—as it provides in the instant case—that in the event of partial damage to the insureds' residence, State Farm agreed to

> pay the cost to repair or replace . . . the damaged part of the property . . . *subject to the following*:
>
> (1) *until* actual repair or replacement is completed, [defendant] will pay *only* the actual cash value *at the time of the loss* of the damaged part of the property. . .
>
> (2) *when* the repair or replacement is actually completed, [defendant] will pay the covered additional amount

> [plaintiffs] actually and necessarily spend to repair or
> replace the damaged part of the property [up to the
> Policy limits]. . . .

*See id.* at 1042; (ECF No. 10-1 at 14 (emphasis added).) Like plaintiffs in the instant case, the insureds in *Kane* suffered covered partial damage to their residences and received step-one "actual cash value at the time of the loss" payments equaling replacement cost less depreciation. *Kane*, 841 A.2d at 1040. Like plaintiffs in the instant case, the insureds in *Kane* argued that under *Fedas*, the step-one Policy term "actual cash value" entitled them to full, upfront "replacement cost" payments—not payments for replacement cost *less* depreciation. *See id.* at 1041. In assessing the insureds' breach of contract claims, the Pennsylvania Superior Court synthesized the holdings of *Fedas*, *Farber*, and *London* as follows:

> [I]n partial [property] loss situations, in the absence of clear language to the
> contrary, an insurer may not deduct depreciation from the *replacement cost*
> of a policy[,] and . . . the phrase "actual cash value" may not be interpreted
> as including a depreciation deduction, *where such deduction would thwart*
> *the insured's expectation to be made whole*. Where qualifying language is
> absent and an insured is promised "actual cash value," the insured is
> entitled to the cost to repair or replace the damaged property. Under *Fedas*
> and *Farber*, . . . [the Pennsylvania] Supreme Court asserts that such
> compensation is the only thing that can make an insured whole. *London* . . .
> holds that a different result can be contracted for, but the policy must be
> clear in that regard.

*Id.* at 1045–47 (emphasis added). In applying these principles, the Pennsylvania Superior Court rejected the insureds' argument that "actual cash value at the time of the loss"—as used in step one of the Policy—equated to full, upfront replacement cost. *Id.* at 1050. In so holding, the court in *Kane* reasoned

> [the Policy does] not contain any definition for "actual cash value." When

read in the context of the language of the [Policy], however, . . . the phrase "actual cash value" as used in [the Policy] cannot be synonymous with replacement value, as [the insureds] contend, as such an interpretation would make the remaining [P]olicy language [promising replacement cost at step two after actual repair or replacement] nonsensical. The language of [the Policy] is clear that only "actual cash value" will be proffered "until" or "unless" repair or replacement is made. (*See* [the] Policy . . . ("*until actual repair or replacement is completed*, [State Farm] will pay only the actual cash value at the time of the loss . . .").)

*Id.* at 1050 (emphasis in original). The Pennsylvania Superior Court, moreover, rejected the insureds' argument that a step-one payment equal to replacement cost less depreciation violated the principles set forth in *Fedas*, *Farber*, and *London*, as State Farm promised to reimburse the insureds full replacement cost up to the Policy's limits at step two. *Id.* at 1048–50. In so holding, the court in *Kane* reasoned

absent from *Fedas*, *Farber*, and *London* . . . is the situation present herein which involves not the denial of liability for *replacement cost*, but the *timing* of that compensation. . . . [State Farm] ha[s] never denied liability or failed to guarantee reimbursement for [full replacement cost up the Policy's limits]. . . . Rather, [State Farm] maintain[s] [it is] only liable for [full replacement cost] once replacement or repair is completed. Unlike *Fedas*, *Farber*, and *London*, wherein the insurers contested liability for [full replacement cost] without including depreciation, here, only the *timing* of such payment[] [for full replacement cost] is at issue. Thus, the policy considerations underlying [*Fedas*, *Farber*, and *London*]—that an insured should be made whole [via full replacement cost], and that in the absence of language to the contrary, to make an insured whole "actual cash value" must be interpreted to mean replacement value without depreciation—apply with less force herein as *there is no question* [*the insureds*] *will be made whole* [via full replacement cost] by [State Farm] ultimately [after they endeavor to repair or replace at step two of the Policy]. . . .

[The insureds] do not assert that the phrase "actual cash value" as used in [the Policy] is ambiguous; rather, they assert that it may not include a deduction for depreciation. We disagree. *The only interpretation of the phrase "actual cash value" in* [*the Policy*] *that makes sense is one that includes depreciation deductions.* Moreover, this interpretation does not run afoul of *Fedas* and *Farber*, . . . as, under [the Policy], the insureds

> ultimately will be made whole [with replacement cost at step two]. That is, . . . there is no concern here, as was present in *Fedas* and *Farber*, that the inclusion of depreciation deductions [in the step-one "actual cash value at the time of the loss" payment] will not fully compensate the insured[s].

*Id.* at 1048–50 (emphasis added) (footnotes omitted). For these reasons, the Pennsylvania Superior Court affirmed the trial court's dismissal of the insureds' breach of contract claims against State Farm. *Id.* at 1051.

In applying *Kane*'s rationale to the instant case, the court concludes plaintiffs fail to allege plausibly that defendant breached the Policy and violated *Fedas* and its progeny, because: (1) the Policy sets forth "clear . . . qualifying" language that step one's "actual cash value at the time of the loss" payment cannot equate to full, upfront replacement cost; (2) plaintiffs are eligible to be "made whole" ultimately with full replacement cost at step two if they repair or replace the partial damage to their home; and (3) the only reasonable interpretation of the Policy language "actual cash value at the time of the loss" is replacement cost less depreciation. *See id.* at 1047–50. In so holding, the court predicts the Pennsylvania Supreme Court would adopt the reasoning set forth in *Kane*. *See Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010) ("'[I]n the absence of an authoritative pronouncement by a state's highest court, [the court] may give serious consideration to the opinion of an intermediate appellate court.'" (quoting *Aetna Cas. & Sur. Co. v. Farrell*, 855 F.2d 146, 148 (3d Cir. 1988))). Each of the three bases for the rationale set forth above is explained in detail below.

First, when read "in its plain and ordinary sense," *St. John*, 106 A.3d at 14, the Policy's language compels the conclusion that "actual cash value at the time of the loss"

cannot reasonably equate to full, upfront replacement cost, as urged by plaintiffs. Plaintiffs' interpretation of "actual cash value at the time of the loss" is "[un]reasonable," as it would render step two of the Policy's replacement cost loss settlement provision meaningless. *See id.* ("Contract language is ambiguous if it is *reasonably* susceptible to more than one construction and meaning." (citing *Steely*, 785 A.2d at 978) (emphasis added)). Under plaintiffs' reading of the Policy term "actual cash value at the time of the loss," plaintiffs are owed full replacement cost at step one pending actual repair or replacement, after which they are *again* entitled to full replacement cost at step two after repair or replacement. The court agrees with the Pennsylvania Superior Court's conclusion in *Kane* that such a reading is "nonsensical" in light of the Policy's clear two-step payment process, under which plaintiffs must first complete actual repair or replacement before becoming eligible for a full replacement cost payment. *Kane*, 841 A.2d at 1050 ("When read in the context of the language of the [Policy], . . . the phrase "actual cash value" . . . cannot be synonymous with replacement value, as [the insureds] contend, as such an interpretation would make the remaining [P]olicy language [promising replacement cost after actual repair or replacement] nonsensical."). The court, therefore, declines to adopt plaintiffs' unreasonable interpretation of the Policy term "actual cash value at the time of the loss." *St. John*, 106 A.3d at 14 ("When the language of an insurance policy is . . . unambiguous, [the] court is bound by that language.").

Second, defendant's step-one payment to plaintiffs of "actual cash value at the time of the loss"—*i.e.*, replacement cost *less* depreciation—does not run afoul of *Fedas* and its progeny, as plaintiffs are eligible to be made "whole" at step two if they repair or

replace the damage to their home. *Kane* recognized that *Fedas*, *Farber*, and *London* held that "in the absence of clear language to the contrary, an insurer may not deduct depreciation from [a] ***replacement cost***" payment, and "'actual cash value' may not be interpreted as including a depreciation deduction, *where such deduction would thwart the insured's expectation to be made whole*" ultimately through a full replacement cost payment. *Kane*, 841 A.2d at 1050 (emphasis added). There is a distinct difference between the situations presented in *Fedas*, *Farber*, and *London*—in which the insured would *never* be paid full replacement cost—and the situation presented in *Kane* and the instant case—in which the Policy expressly provides that full replacement costs will be paid to plaintiffs at step two if they repair or replace the damage to their home.

As the court in *Kane* observed, the Policy's unambiguous language obligates defendant to pay plaintiffs full replacement cost—but only *after* plaintiffs endeavor to repair or replace the damage to their residence. Like it did in *Kane*, State Farm does not dispute it must pay plaintiffs full replacement cost in this case; it disputes only *when* it must do so pursuant to the Policy's two-step procedure. *Cf. id.* at 1041. ("[State Farm] do[es] not dispute [the insureds'] entitlement to replacement cost coverage, but, rather, [it] assert[s] that the [Policy] specif[ies] that [the insureds] must first undertake to repair or replace the damaged property before being fully compensated [with replacement cost]."). Like the insureds in *Kane*, plaintiffs in the instant case cannot allege State Farm "thwart[ed] [the insureds'] expectation to be made whole" because depreciation will not be deducted from their *ultimate* replacement cost payment, if they complete step two. *Id.*; *see* (ECF No. 21-1 at 4–9 (defendant's replacement cost estimate characterizing the

*entire* $327.68 of subtracted "[d]epreciation" as "replacement cost benefits ([*i.e.,*] *recoverable* depreciation)" upon plaintiffs' completion of step two (emphasis added)).) Plaintiffs allege expressly that they did not meet the requirements of step two of the Policy because they did not repair or replace the damage to their home. *See* (ECF No. 10 at 5 ¶ 16.) Plaintiffs' allegations, therefore, fail to raise the plausible inference that defendant breached the Policy by subtracting depreciation from their ultimate replacement cost payment in violation of *Fedas*, as plaintiffs are not eligible for a replacement cost payment under the Policy until they actually repair or replace the damage to their home.

Third, the only reasonable interpretation of the language "actual cash value at the time of the loss"—as used in step one of the Policy—is replacement cost less depreciation. In so holding, the court agrees with—but expounds upon—the Pennsylvania Superior Court's conclusory pronouncement in *Kane* that the "only interpretation of the phrase 'actual cash value [at the time of the loss]' in [the Policy] that makes sense is one that includes depreciation deductions." *Kane*, 841 A.2d at 1050.

As the Pennsylvania Superior Court noted in *Kane*, "*London* stands for the proposition that, although *Fedas* and *Farber* . . . remain viable, *explicit policy language may avoid their effects.*" *Id.* at 1047 (emphasis added). At step one, the Policy's plain language promises to pay an amount equal to the property's "actual cash **value** *at the time of* [*its*] *loss*"—not its actual cash "cost" to repair or replace. (ECF No. 10-1 at 14 (emphasis added).) The Policy's explicit distinction between "value" and "cost" is critical. Generally, property connected to the home—*e.g.*, plaintiffs' roof—has

deteriorated to some degree from use and wear and tear "at the time of [its] loss." *Id.* Such deterioration diminishes the actual value—or real worth—of that property, as evidenced by the fact that used property's cash *value* is, in most circumstances, lower than its cash *cost* to repair or replace with new property. In the property insurance context, this value diminution is called "depreciation." *See Dickler*, 957 F.2d at 1098 (quoting Lehmann); (ECF No. 21-3 (defendant's May 13, 2015 replacement cost estimate defining "[d]epreciation" as the "decrease in the value of property over a period of time due to wear, tear, condition, and obsolescence").) The court concludes, therefore, that the Policy sets forth "explicit" and "clear . . . qualifying language" that "actual cash value at the time of the loss" equates to replacement cost less an amount reflecting the property's diminished worth caused by wear, tear, condition, and obsolescence (*i.e.*, depreciation). *Kane*, 841 A.2d at 1045–47 (providing that such "explicit" and "clear . . . qualifying language" satisfies *Fedas* and its progeny).

In sum, the court concludes: (1) the Policy sets forth "clear . . . qualifying" language that step-one's "actual cash value at the time of the loss" payment cannot equate to full, upfront replacement cost; (2) plaintiffs are eligible to be "made whole" ultimately with full replacement cost at step two if they repair or replace the partial damage to their home; and (3) the only reasonable interpretation of the Policy language "actual cash value at the time of the loss" is replacement cost less depreciation. For these reasons and because plaintiffs' arguments lack merit as a matter of law, the court will dismiss plaintiffs' class-wide depreciation-based breach of contract claim pursuant to Rule 12(b)(6).

### (y).   Including taxes and labor in the estimated amount of repair or replacement costs before depreciation is deducted

On behalf of a putative class, plaintiffs allege that even if Pennsylvania law permits depreciation deductions from replacement cost to arrive at "actual cash value at the time of the loss" under the Policy's first step, defendant breached the Policy by using "non-depreciable components"—*i.e.*, tax and labor costs—to estimate replacement costs. *See* (ECF No. 10 at 4–5 ¶ 11.) Plaintiffs' position is that only the estimated costs of *physical* materials depreciate in value from use and wear and tear—not tax and labor costs. Plaintiffs argue it is unlawful to include amounts for non-depreciable items—*i.e.*, tax and labor costs—in estimations of replacement cost from which depreciation is deducted to arrive at "actual cash value at the time of the loss."

The Pennsylvania Supreme Court has yet to address whether a property insurer indemnifying against partial loss may include tax and labor costs, in addition to the costs of physical materials, in estimating replacement cost from which depreciation is deducted to arrive at "actual cash value at the time of the loss." To resolve the instant Rule 12(b)(6) motion to dismiss, the court must predict how the Pennsylvania Supreme Court would resolve these matters of state law. *See, e.g.*, *Sansom v. Crown Equip. Corp.*, 880 F. Supp. 2d 648, 654 (W.D. Pa. 2012) (citing *Holmes*, 598 F.3d at 118). "In predicting how the [Pennsylvania Supreme Court] would decide [these state law issues]," the court may "look to analogous state court cases." *Holmes*, 598 F.3d at 118. The court "may also look to 'scholarly treatises'" and "'germane law review articles.'" *Id.* (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662–63 (3d Cir. 1980)) (footnotes omitted).

38

"'[R]elevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince.'" *Id.* (quoting *McKenna*, 622 F.2d at 662).

State and federal courts in other jurisdictions have addressed whether property insurers may use tax and labor costs to estimate replacement costs from which depreciation is deducted to arrive at "actual cash value at the time of the loss." Courts agree taxes should be included in the estimated costs of replacement from which depreciation is deducted.[11] Courts have reached differing conclusions with respect to whether labor costs should be included in the estimated costs of replacement from which depreciation is deducted.[12]

---

[11] *Gee v. State Farm Fire & Cas. Co.*, Civ. A. No. 11-250, 2013 WL 8284483, at *3 (N.D. Ill. Sept. 23, 2013) ("The court finds that defendant's application of its depreciation reduction to sales tax along with the other components of the replacement cost calculation is consistent with the clear intent of the policy and with the established meaning evidenced by interpretations of similar terms."); *Tolar v. Allstate Tex. Lloyd's Co.*, 772 F. Supp. 2d 825, 831 (N.D. Tex. 2011) ("Because . . . sales tax . . . [factors into] total replacement cost value, it follows naturally that . . . sales tax . . . ought to be depreciated [with other factors reflecting replacement cost] to reach the [actual cash value] payment."); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1305 (11th Cir. 2008) ("As to taxes, we easily conclude that 'the cost to repair or replace property with new materials' would necessarily include the state and local taxes on the materials purchased to make the repairs. Part of 'the cost' of new materials is the taxes paid to purchase those materials.").

[12] Some courts have concluded labor costs should be included in the estimated costs of replacement from which depreciation is deducted. *Graves v. Am. Family Mut. Ins. Co.*, Civ. A. No. 14-2417, 2015 WL 4478468, at *4 (D. Kan. July 22, 2015) ("When [the insured] purchased her homeowner's insurance policy, she was not separately insuring the materials and labor involved, but uniformly insuring the roof."); *Redcorn*, 55 P.3d at 1021 ("A roof is the product of both materials and labor just as a building is the product of both materials and labor. Age and condition of a roof is relevant evidence in determining actual cash value."); *Branch v. Farmers Ins. Co.*, 55 P.3d 1023, 1027 (Okla.

After examining these authorities, the court predicts the Pennsylvania Supreme Court would conclude defendant did not breach the Policy by including tax and labor costs, in addition to the costs of physical materials, in estimating replacement costs from which depreciation was deducted to arrive at plaintiffs' "actual cash value at the time of the loss" payment.

In this case, the Policy's plain language compels the court's conclusion. *See Madison Constr. Co.*, 735 A.2d at 106 ("The polestar of [the court's] inquiry . . . is the language of the insurance policy."). Contrary to plaintiffs' proffered interpretation, defendant did not promise at step one of the Policy to pay the present-day "actual cash value" of whatever labor and taxes plaintiffs require to repair or replace their roof. Such an interpretation of the Policy language "actual cash value at the time of the loss" equates

---

2002) ("[R]eplacement cost includes the labor involved in replacement, and therefore is subject to depreciation under a 'replacement cost less depreciation' endorsement in the insurance policy.").

Other courts have concluded labor costs should not be included in the estimated costs of replacement from which depreciation is deducted. *Bailey v. State Farm Fire & Cas. Co.*, Civ. A. No. 14-53, 2015 WL 1401640, at *8 (E.D. Ky. Mar. 25, 2015) ("The very idea of depreciating the value of labor defies good common society. To adequately indemnify its insureds, State Farm should pay the cost of materials, depreciated for wear and tear, plus the cost of their installation."); *Wilcox v. State Farm Fire & Cas. Co.*, Civ. A. No. 14-2798, 2015 WL 927093, at *5 (D. Minn. Jan. 16, 2015) ("Unlike materials, labor is not subject to 'wear, tear, condition, or obsolescence[,]' [and] [t]herefore, the calculation of actual cash value should not include depreciated labor."), *report & recommendation adopted in part, rejected in part*, 2015 WL 927342 (D. Minn. Mar. 4, 2015) (rejecting the magistrate judge's recommendation and certifying to the Minnesota Supreme Court the question whether "an insurer, in determining the 'actual cash value' of a covered loss under an indemnity insurance policy, [may] depreciate the costs of labor when the term 'actual cash value' is not defined in the policy. . .'"); *Adams v. Cameron Mut. Ins. Co.*, 430 S.W.3d 675, 679 (Ark. 2013), *reh'g denied* (Jan. 9, 2014) ("We . . . simply cannot say that labor falls within that which can be depreciable.").

impermissibly to full "replacement cost," to which plaintiffs are not entitled until they endeavor to repair or replace their roof, as set forth in step two of the Policy. *Kane*, 841 A.2d at 1050 ("'[A]ctual cash value' as used in [the Policy] cannot be synonymous with replacement [cost]."). At step one of the Policy, defendant promised to pay plaintiffs the "actual cash *value . . . of the damaged . . . property*," measured "at the time of [its] loss." *See* (ECF No. 10-1 at 14 (emphasis added).) When a roof is in issue, as it is here, the "plain and ordinary" meaning of the "property" to which the Policy refers is the *finished* product in issue—the *result* or physical manifestation of combining knowhow, labor, physical materials (including attendant costs, *e.g.*, the incurrence of taxes), and anything else required to produce the final, finished roof itself. *St. John*, 106 A.3d at 14 (citing *Riccio*, 705 A.2d at 426); *Redcorn*, 55 P.3d at 1020 ("A building is the product of *both* materials and labor." (emphasis added)).

To adopt plaintiffs' view that "property"—as used in step one of the Policy—equates to "all *physical* materials required to produce the covered building *but nothing else*" strains reason. The ordinary meaning of "property" is "any external thing over which the rights of possession, use, and enjoyment are exercised." *Property*, BLACK'S LAW DICTIONARY (9th ed. 2009); *Madison Constr. Co.*, 735 A.2d at 108 (the court "may inform [its] understanding of [insurance policy] terms by considering their dictionary definitions"). The property owner exercises the right to possess, use, and enjoy the *outcome* of combining labor, tax costs, and materials—*i.e.*, the property itself in its finished form. In the same sense, defendant indemnified plaintiffs at step one of the Policy against the loss of the value of the *outcome* of combining labor, tax costs, and

materials—*i.e.*, the covered property itself. *Cf. Redcorn*, 55 P.3d at 1021 ("[The plaintiff] insured a roof surface, not two components, material and labor. He did not pay for a hybrid policy of actual cash value for roofing materials and replacement costs for labor."). Defendant promised full replacement cost (including tax, labor, and materials costs) at step *two* of the Policy—not step one. As used in the Policy, "property" cannot reasonably be interpreted in the manner plaintiffs urge. "When the language of an insurance policy is plain and unambiguous, [the] court is bound by that language." *St. John*, 106 A.3d at 14.

Given its age and deterioration "at the time of [its] loss," the "value" of the "property" at issue in this case—*i.e.*, plaintiffs' finished roof—suffered diminution. In the insurance context, that diminution in value is called "depreciation." The Pennsylvania Superior Court made clear in *Kane* that defendant may deduct "depreciation" from the estimated amount of replacement costs to determine the step-one "actual cash value at the time of the loss" payment under the Policy, provided defendant makes the insured whole with the full replacement cost (up to the Policy limits) upon repair or replacement at step two. *See Kane*, 841 A.2d at 1048–50. In this case, defendant's practices—as set forth by plaintiffs in their amended complaint—comport with *Kane*. Defendant deducted depreciation from the estimated amount of materials, tax, and labor costs at step one of the Policy and promised to make plaintiffs whole at step two with the full replacement cost. *See* (ECF No. 21-1 at 4 (characterizing the entirety of the $327.68 depreciation deduction as "[r]eplacement [c]ost [b]enefits," *i.e.*, "*recoverable* depreciation" upon repair or replacement (emphasis added)).) Plaintiffs' decision not to take the actions

42

necessary to entitle them to the full replacement cost payment under step two of the settlement provision does not render that provision ambiguous.

The court concludes plaintiffs' claim that defendant breached the Policy by including taxes and labor in the replacement costs from which depreciation was deducted to arrive at "actual cash value at the time of the loss" is without merit as a matter of law. Consequently, plaintiffs' class-wide breach of contract claim will be dismissed pursuant to Pennsylvania law and Rule 12(b)(6).[13]

---

[13] In *Redcorn*, Justice Boudreau of the Oklahoma Supreme Court issued a dissent upon which courts have relied to hold that labor cannot be depreciated. *See, e.g.*, *Adams*, 430 S.W.3d 679 (Arkansas Supreme Court relying on Justice Boudreau's *Redcorn* dissent). In his dissent in *Redcorn*, Justice Boudreau observed, in relevant part:

> I reject the majority's characterization of [the insured's] roof as a single product. A roof, unlike a preassembled consumer good, is not an integrated product. [The insured] cannot go the lumber yard or the retail store and buy a roof. A roof does not exist until the shingles are transported to the site and installed on top of the house. A roof is not a unified product but a combination of a product (shingles) and a service (labor to install the shingles).

> The shingles are of course logically depreciable. As they age, they certainly lose value due to wear and tear. They typically have a useful life of twenty years. It makes sense, then, that sixteen-year-old shingles have lost sixteen/twentieths, or eighty percent, of their value over time.

> Labor, on the other hand, is not logically depreciable. Does labor lose value due to wear and tear? Does labor lose value over time? What is the typical depreciable life of labor? Is there a statistical table that delineates how labor loses value over time? I think the logical answers are no, no, it is not depreciable, and no. The very idea of depreciating the value of labor is illogical. The image that comes to me is that of a very old roofer with debilitating arthritis who can barely climb a ladder or hammer a nail. The value of his labor, I suppose, has depreciated over time.

> It is important to keep in mind that indemnity is the basis and foundation of

## ii. __Breach of a duty implied by the Policy__

As an alternative class-wide breach of contract theory, plaintiffs allege defendant violated the Policy's implied duty of good faith and fair dealing. In particular, plaintiffs allege the Policy is silent with respect to whether defendant may subtract depreciation from the estimated replacement costs (reflecting materials, taxes, and labor) to arrive at the amount of the step-one payment. *See* (ECF No. 10 at 14 ¶ 50 (alleging the "[P]olicy does not contain language . . . [that] would qualify the [phrase 'actual cash value'] to be derived by applying a deduction for depreciation").) Plaintiffs argue the Policy language

---

all insurance law. The objective of indemnity is to put the insured in as good a condition, as far as practicable, as he would have been in if the loss had not occurred, that is, to reimburse the insured for the loss sustained, no more, no less. To properly indemnify [the insured], State Farm should pay him the actual cash value of the shingles, depreciated for wear and tear, plus the cost of their installation. In my view, allowing State Farm to depreciate the cost of labor would leave [the insured] with a significant out-of-pocket loss, a result that is inconsistent with the principle of indemnity.

*Redcorn*, 55 P.3d at 1022–23 (Boudreau, J., dissenting).

In light of the Policy's plain language, Justice Boudreau's contention that "[l]abor . . . is not logically depreciable" is inapposite in this case. The issue before the court is not whether "labor"—*i.e.*, the physical act of laboring to produce a product in the abstract—is "logically" depreciable. The issue in this case is what defendant agreed to pay for in the event of partial damage to plaintiffs' home, pursuant to the Policy's plain language. The Policy's first step promises payment commensurate with the loss of the damaged "property['s]" value, measured at the time of its loss. The natural definition of "property"—as used in step one of the Policy—is the finished product, the *result* of the labor. Here, the result of the labor—*i.e.*, plaintiffs' roof—is plainly and logically depreciable. The Policy's first step does not promise the insured payment of the market value of whatever labor may be required to repair or replace that "property," Justice Boudreau's broad indemnification theory notwithstanding. Plaintiffs are, in any event, eligible to be "made whole" with reimbursements for full replacement costs at step two, which include reimbursements for labor costs. Step two of the Policy, therefore, cuts against Justice Boudreau's contention that the insured will not be made whole in the absence of an upfront payment for labor costs.

44

"actual cash value" is ambiguous "[a]t best" and "inconspicuous[ly] . . . buried" within the Policy. (*Id.* at 14 ¶ 50, 12 ¶ 42.) In light of this asserted ambiguity and inconspicuous placement—and plaintiffs' premium payments for what they assumed was full, upfront "replacement cost"—plaintiffs allege they "had a reasonable expectation" the "actual cash value" payment "would not be altered, changed[,] or reduced" by defendant. (*Id.* at 13 ¶ 43.) Plaintiffs assert that by subtracting depreciation from the estimated replacement costs (reflecting materials, taxes, and labor) to arrive at the step-one payment—without express authorization from the Policy—defendant "knowingly" and "intentionally" frustrated their "reasonable expectations," in violation of Pennsylvania's implied contractual obligation of good faith and fair dealing. *See* (*id.* at 15 ¶¶ 52–54.)

The Pennsylvania Supreme Court has long recognized that the "'utmost fair dealing should characterize the transactions between an insurance company and the insured.'" *Dercoli v. Pa. Nat'l Mut. Ins. Co.*, 554 A.2d 906, 909 (Pa. 1989) (quoting *Fedas*, 151 A. at 286). The insurer has a duty to deal with its insured "on a fair and frank basis, and at all times, to act in good faith." *Id.*; *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 416 (Pa. Super. Ct. 2004). Pennsylvania' implied duty of good faith and fair dealing "creates an obligation to disclose fully the coverage and any requirements under the policy." *Burton*, 845 A.2d at 899. "The law implies this duty of good faith into the insurance contract, and thus the 'breach of such an obligation constitutes a breach of the insurance contract.'" *Berg v. Nationwide Mut. Ins. Co.*, 44 A.3d 1164, 1170 (Pa. Super. Ct. 2012) (quoting *Gray v. Nationwide Mut. Ins. Co.*, 223 A.2d 8, 11 (Pa. 1966)); *Birth Ctr. v. St. Paul Cos.*, 787 A.2d 376, 385 (Pa. 2001) (holding breach of the duty to act in

good faith "constitutes a breach of the insurance contract").

The Pennsylvania Superior Court's decision in *Burton*, 845 A.2 889, provides guidance in analyzing plaintiffs' claim for breach of the implied duty of good faith. In *Burton*, the insured challenged a homeowners' insurance policy containing a two-step loss settlement procedure similar to that in the case *sub judice*. *Id.* at 893. Like the Policy in the instant case, the policy in *Burton* obligated the insurer to pay "no more than the actual cash value for the loss or damage" to the insured's residence "until the actual repair or replacement [was] completed" by the insured. *Id.* at 894.

Like plaintiffs' argument in the instant case, the insured in *Burton* argued the phrase "actual cash value" was "ambiguous" because "the policy d[id] not define it" or expressly provide that it included "withholding of depreciation until [the insured] complete[d] actual repair or replacement." *Id.* The Pennsylvania Superior Court rejected the insured's argument in *Burton*, holding

> our focus is not limited to the definition of a single phrase[—*i.e.*, "actual cash value."] Indeed, we cannot conclude that an isolated phrase is ambiguous simply because [the insurer] failed to define it specifically in the policy. Rather, we examine the policy in its entirety to determine whether it clearly, explicitly, and unambiguously conditions full replacement benefits upon the actual repair or replacement of the damaged property. We conclude that it does.
>
> A routine reading of the policy and [two-step loss procedure] demonstrates that replacement benefits are conditioned upon complete repair or replacement. . . . [T]he policy explains that [the insurer] "will pay no more than the actual cash value of the damage *until* actual repair or replacement is complete. . . ." [W]hen the . . . policy language is read in its entirety, it is clear and unambiguous. As the policy plainly sets forth the procedure for recovering replacement costs, a contrary construction is unreasonable.

*Id.* (citing *Riccio*, 705 A.2d 422) (emphasis added).

46

Like plaintiffs' argument in the instant case, the insured in *Burton* argued the two-step loss settlement procedure was "not clearly worded or conspicuously displayed, thereby rendering [it] unenforceable." *Id.* at 895. The Pennsylvania Superior Court rejected this argument, holding the policy was not ambiguous because "both the policy and [loss settlement provision] present[ed] the procedure for recovering full replacement costs clearly. . . . [A]s the trial court noted, '[t]he language set forth is not confusing, misleading, or ambiguous. It is the same size and style of print as . . . the remainder of the policy.'" *Id.* (quoting *Burton v. Republic Ins. Co.*, Civ. A. No. 94-18122, 2002 WL 34103068 (Pa. Ct. Com. Pl. June 7, 2002) (noting the loss settlement procedure was "clearly stated in the [policy]" and that the court "[could not] find that the reasonable expectations of the insureds were frustrated")). Based upon, *inter alia*, the foregoing analysis, the Pennsylvania Superior Court affirmed the trial court's grant of summary judgment in favor of the insurer with respect to the insured's claim for breach of the implied duty of good faith and fair dealing. *Id.* at 900.

Like the policy in *Burton*, the two-step loss settlement procedure at issue in the instant case is "clear and unambiguous." *Id.* at 894. Defendant's obligation to pay full replacement cost under the Policy is conditioned upon plaintiffs actually repairing or replacing the damaged property. As noted previously, the Policy provides, in relevant part:

> [Defendant] will pay the cost to repair or replace . . . the damaged part of [plaintiffs' covered] property . . . subject to the following:
>
> (1) ***until actual repair or replacement is completed***,

> [defendant] will pay **only** the actual cash value at the time of the loss of the damaged part of the property [up to the Policy limits]. . . ; [and]
>
> (2) **when the repair or replacement is actually completed**, [defendant] will pay the covered additional amount [plaintiffs] actually and necessarily spend to repair or replace the damaged part of the property [up to the Policy limits]. . . .

(ECF No. 10-1 at 14 (emphasis added).) Guided by *Burton*, and for the reasons discussed previously, the court concludes the Policy's language "'is not confusing, misleading, or ambiguous'" in providing that plaintiffs must *first* endeavor to repair or replace before receiving full replacement cost from defendant. *Burton*, 845 A.2 at 895 (quoting *Republic Ins. Co.*, 2002 WL 34103068); *cf. Kane*, 841 A.2d at 1049 ("When read in the context of the language of [the *identical* Policy at issue in the instant case], . . . we note . . . that the phrase 'actual cash value' as used in [the Policy] cannot be synonymous with ['replacement cost'], . . . as such an interpretation would make the remaining [P]olicy language nonsensical. . . . The only interpretation of the phrase "actual cash value" in [the Policy] that makes sense is one that includes depreciation deductions."); *Pellegrino v. State Farm Fire & Cas. Co.*, Civ. A. No. 12-2065, 2013 WL 3878591, at *7 (E.D. Pa. July 29, 2013) ("As in *Kane*, [the insured in *Pellegrino*] need only follow the [two-step] procedures laid out in the contract to receive the additional replacement costs.").

In addition to being unambiguous, the two-step loss settlement provision is set forth conspicuously in the Policy, as it is "'the same size and style of print as . . . the remainder of [the Policy].'" *Burton*, 845 A.2d at 895 (quoting *Republic Ins. Co.*, 2002 WL 34103068).

The court finds *Burton*'s rationale persuasive. The court concludes the Policy is not ambiguous or misleading and defendant did not frustrate plaintiffs' reasonable expectations by acting in bad faith. *Id.* (citing *Republic Ins. Co.*, 2002 WL 34103068). For these reasons, the court concludes plaintiffs fail to allege facts raising the plausible inference that defendant violated Pennsylvania's implied contractual duty of good faith with respect to putative class members. Plaintiffs' class-wide bad faith breach of contract claim will be dismissed. *Twombly*, 550 U.S. at 555 ("Factual allegations must be . . . sufficient to state a claim for relief that is plausible on its face.").

### 2. Plaintiffs' individual and class-wide § 8371 statutory bad faith claims

Pennsylvania's bad faith insurance statute provides, in relevant part:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim. . . .
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. § 8371. To state a claim under § 8371, plaintiffs must allege facts from which the court can draw the plausible inference that defendant: (1) had no reasonable basis upon which to deny plaintiffs' benefits under the Policy; and (2) knew about or recklessly disregarded its lack of a reasonable basis to deny plaintiffs' claim. *Berg*, 44 A.3d at 1170–71 (citing *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999)). "The insured must also show that the insurer breached a

known duty (*i.e.,* the duty of good faith and fair dealing) through a motive of self-interest or ill will." *Id.*

### a.      <u>Plaintiffs' individual § 8371 claim</u>

As stated previously, the named plaintiffs allege defendant refused to pay for covered damage to their residence in the amount of $32,500.00, in violation of the Policy. Because the parties dispute whether defendant had a reasonable basis upon which to deny plaintiffs' benefits under the Policy, the court concluded at the October 29, 2015 hearing that regardless whether depreciation was properly deducted from the first step payment under the Policy, plaintiffs state a plausible individual § 8371 bad faith claim against defendant.

### b.      <u>Plaintiffs' class-wide § 8371 claim</u>

Because the court concludes plaintiffs fail to allege plausibly that defendant breached the implied contractual duty of good faith and fair dealing with respect to the putative class, the court must conclude plaintiffs fail to state plausible class-wide bad faith claims pursuant to § 8371. The "success of [plaintiffs' class-wide] bad faith claim [under § 8371] is contingent upon a finding that [State Farm's payment] procedure constitutes a breach of contract" with respect to putative class members. *Pellegrino*, 2013 WL 3878591, at *8 (citing *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999)); *Berg*, 44 A.3d at 1170–71 ("The insured *must* . . . show that the insurer breached a known duty (*i.e.,* the duty of good faith and fair dealing). . . . " (emphasis added)).

To support their class-wide statutory bad faith claims under § 8371, plaintiffs repurpose the same factual allegations propounded to support their class-wide contractual bad faith claims. Because those factual allegations fail to raise the plausible inference that defendant acted in bad faith with respect to putative class-members in violation of the implied contractual duty of good faith, they fail to raise the plausible inference that defendant acted in bad faith with respect to putative class members in violation of § 8371. *Cf. Pellegrino*, 2013 WL 3878591, at *8 ("The only behavior [the insured] point to as being 'in bad faith' [under § 8371] was the withholding of ['paid when incurred'] payments, which [the insured] argued violated the terms of the insurance policy. . . . Because [the court found previously in its analysis] that designating these proceeds as ['paid when incurred'] does not breach the insurance policy, [the insured's] claim for bad faith [under § 8371] also fails."). Plaintiffs' class-wide § 8371 bad faith claims must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim under Pennsylvania law.[14]

---

[14] Plaintiffs allege defendant violated § 8371 by: (1) "applying artificially inflated depreciation deductions"; (2) "calculat[ing] depreciation in a manner that inflated the amount of any deduction for depreciation"; (3) "concocting the application of a method of depreciation for the purpose of systematically inflating depreciation deductions"; and (4) "using claim handling techniques, including inflating depreciation deductions, designed to frustrate the policyholders [*sic*] demand for and right to full payment of the replacement cost for partial damage to their residence." (ECF No. 10 ¶¶ 62, 63, 64.c., 64.j.)

These allegations are not entitled to the assumption of truth because they are legal conclusions unsupported by factual allegations. *Iqbal*, 556 U.S. at 678 ("While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations [to survive a Rule 12(b)(6) motion to dismiss]."). Defendant's May 13, 2015 replacement cost estimate provides a detailed, itemized breakdown of the percentage and amount depreciated with respect to each prospective outlay required to replace the damaged portions of plaintiffs' residence. *See* (ECF No. 21-1 at 6–9 (setting forth the "AGE/LIFE CONDITION" and "DEPREC. [%]" with respect to each of

### 3.    Plaintiffs' individual and class-wide CPL claims

Pennsylvania's CPL prohibits, *inter alia*, "unfair or deceptive acts or practices" in the "conduct of any trade or commerce" and creates a private cause of action for actual and treble damages for "ascertainable loss" resulting therefrom. 73 PA. STAT. §§ 201-3, 201-9.2(a). In relevant part, the CPL defines an "unfair or deceptive act or practice" as:

> (iv)    [u]sing deceptive representations . . . in connection with . . . services;

> (vii)    [r]epresenting that . . . services are of a particular standard [or] quality . . . if they are of another; [and]

> (xxi)    [e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 PA. STAT. §§ 201-2(4)(v), (vii), (xxi); *see* (ECF No. 10 at 22 ¶ 84 (plaintiffs' amended complaint alleging claims pursuant to these specific CPL provisions).) To state a claim under Pennsylvania's CPL, plaintiffs must allege facts from which the court can plausibly infer: (1) deceptive conduct or representations by defendant; and (2) justifiable reliance by plaintiffs on defendant's deceptive conduct that caused plaintiffs' harm. *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

In support of their individual and class-wide CPL claims, plaintiffs allege: (1) defendant "advertised and represented" that the Policy provided "replacement cost for partial damage to" plaintiffs' residence; (2) defendant did so with the "inten[t] to induce

---

twenty-two prospective outlays). Without plausible assertions with respect to the reasons this itemized breakdown is "artificial" and "inflated," the court cannot accept plaintiffs' conclusory class-wide allegations as true in ruling on defendant's Rule 12(b)(6) motion to dismiss.

[plaintiffs] to purchase" the Policy and with "kn[owledge]" that its representations were "materially false, deceptive[,] and would create confusion and misunderstanding"; and (3) plaintiffs "were so induced and did purchase [the Policy] in reliance [on defendant's claims], which reliance was justifiable." (ECF No. 10 at 20 ¶¶ 74–77.)

Plaintiffs' allegations in support of their individual and class-wide CPL claims are not entitled to the assumption of truth because they are legal conclusions unsupported by factual allegations. *Iqbal*, 556 U.S. at 678 ("While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations [to survive a Rule 12(b)(6) motion to dismiss]."). Plaintiffs propound only a "[t]hreadbare recital[] of the elements of" individual and class-wide CPL claims, "supported by mere conclusory statements." *Id.* (citing *Twombly*, 550 U.S. at 555). Plaintiffs' allegations, therefore, "do not suffice" to state plausible individual and class-wide CPL claims under Pennsylvania law. *Id.*; *Toy*, 928 A.2d at 208; *Yocca*, 854 A.2d at 438.

Even assuming, *arguendo*, the truth of plaintiffs' conclusory individual and class-wide CPL allegations, the court concludes: (1) defendant conspicuously and unambiguously set forth the two-step loss settlement procedure in the Policy; and (2) agreed to pay "actual cash value at the time of the loss" (*i.e.*, estimated replacement costs less depreciation) in step one of the Policy and an additional amount to arrive at a total payment equaling full replacement cost upon repair or replacement at step two, in accordance with Pennsylvania law. *Kane*, 841 A.2d 1038. "'[I]t is not deceptive for an insurer to adhere to the unambiguous language of a policy and pay claims in accordance with those terms.'" *Pellegrino*, 2013 WL 3878591, at *8 (quoting *Caroselli, Sr. v.*

*Allstate Prop. & Cas. Ins. Co.*, Civ. A. No. 10-1671, 2010 WL 3239356, at *8 (E.D. Pa. Aug. 16, 2010)). Plaintiffs' factual allegations raise the reasonable inference that plaintiffs "did not receive replacement cost because [they] failed to [endeavor to repair their residence]" in accordance with the Policy—not "because [State Farm] deceived [them]." *Caroselli, Sr.*, 2010 WL 3239356, at *8 ("[The insured] was not entitled to replacement cost because he failed to meet a clearly stated precondition to receiving replacement costs.").

For these reasons, plaintiffs' individual and class-wide CPL claims will be dismissed for failure to state a claim, pursuant to Pennsylvania law and Rule 12(b)(6).

## IV.    CONCLUSION

For the reasons set forth at the October 29, 2015 hearing and in this opinion, the court will: (1) deny plaintiffs' motion for remand or abstention; and (2) deny in part and grant in part defendant's Rule 12(b)(6) motion to dismiss. Plaintiffs' individual breach of contract and individual statutory bad faith claims shall proceed. Plaintiffs' individual CPL claim and class-wide breach of contract, statutory bad faith, and CPL claims will be dismissed with prejudice for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).

An appropriate order will follow.

DATED:        November 16, 2015

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge